SULLIVAN, Justice,
for the Court:
The Lee County Grand Jury, in its February 1990 term, returned an indictment charging that William Floyd Hale, on the 29th day of November, A.D., 1988, committed perjury as a member of a venire in Lee County by failing to respond to questions put to the jury during the voir dire while under oath. The trial began on May 28, 1991, and the jury returned a verdict of guilty on the charge of perjury. This verdict was filed on June 1, 1991. The court sentenced Hale on June 7, 1991, to a term of ten (10) years in the custody of the Mississippi Department of Corrections, payment of a fine of $10,000.00 and restitution of $9,032.00 for cost of the trial in which he served as a juror.
On June 7, 1991, Hale filed a motion for a new trial which was denied the same day. Hale filed his notice of appeal on June 7, 1991.
On or about November 29, 1988, the Lee County Circuit Court conducted voir dire for the murder trial of James Wright (Wright I). Roy Parker and Dan McIntosh represented the defendant, while District Attorney John R. Young and Assistant District Attorneys Rowland Geddie and Sam Reedy represented the State, with the Honorable Thomas J. Gardner, III presiding. William Floyd Hale was present during the voir dire as venireman number eleven.
The court administered the following oath to the venire: “Do you solemnly swear or affirm to give true answers to all questions propounded to you by the Court and the attorneys in the selection of juries for the trial of cases this week, so help you God?” Before conducting his examination of the ve- *533 ñire Judge Gardner informed them, “It is important that you make whatever response you might have to these questions. If you happen to be friends with someone, or if you know of some circumstances that you feel like you need to tell us about, then certainly don’t be embarrassed about it.” Pertinent questions directed to the venire included:
1. Are either of you close personal friends or have any relationship whatsoever with either of the attorneys who will participate in this trial?
2. Has anyone been represented by either of these attorneys in the past?
3. Is there anything about either of the lawyers who will participate in this case that would cause you any problem whatsoever in serving as a juror in the trial of this case?
4. Do either of you, because of anything you might have heard, seen, read, or whatever, have any opinion whatsoever about the way this ease should be decided?
5. ... is there anything at all, not previously talked about, that you think would influence you unduly, or cause you to not be fair to either side?
6. Are there now any of you-who, for any reason, feel that you cannot and should not sit as a juror in the trial of this case, and that you have not responded during the course of the examination? Do you have any other or a different response to any of the questions?
District Attorney John Young made the following inquiries of the venire:
1. I would like to ask you about Mr. Parker now. I believe you were asked the question, is he presently representing any of you and no one responded to that; is that my understanding? Is he presently representing anybody or any member of your family on any particular matter? And as to having represented you in the past, has he represented any of you in the past on any legal matter?
2. Do any of you consider yourselves personal friends with Mr. Parker?
John who is sitting over there in the blue coat. Are any of you close personal friends with Roy Parker’s son, John Parker, who works with him in his lawfirm? (Parker’s son was an investigator and legal assistant). 3.
4. ... if we prove to you as the law requires that we prove that the Defendant, James Wright, is guilty of the crime of murder in the death of his wife, Sharon, is there anyone on the panel at this time that could not return a verdict of guilty as charged?
William Floyd Hale did not respond to any questions asked during voir dire. Hale was ultimately seated as a member of the jury for the Wright I trial. Wright I was eventually declared a mistrial when the jury deadlocked 11-1 with Hale the lone vote for acquittal.
After the conclusion of the trial, Judge Gardner received information of possible improprieties concerning the jury and asked Rowland Geddie of the District Attorney’s Office to have the matter looked into. On the same day the trial ended, Geddie was having lunch in a local restaurant when an angry juror from the Wright I trial approached him alleging misconduct on the part of Hale. The investigation was turned over to Kerry Slack of the Tupelo Police Department. Based in part on information gathered by Slack, an indictment charging perjury was returned against Hale. Geddie presented the evidence to the grand jury.
Hale’s trial began on May 28, 1991, with Robert Coleman and James S. Pounds representing the State as Young, Geddie and Reedy were recused due to their involvement in Wright I. The State called Judge Gardner as its first witness. Judge Gardner went over the general voir dire procedure and specific questions he asked of the venire during Wright I. Judge Gardner stated he had no reason to believe Hale did not understand the questions asked during voir dire.
The State introduced documents which indicated the existence of a relationship between Hale and Roy Parker:
1. A Notice of Deposition in Lee County Circuit Court, cause number 17,058, William F. Hale, d/b/a Hale Construc *534 tion Company v. Alf Harding and Eva Mae Harding. The certificate is signed by Roy 0. Parker and dated December 16, 1981. An Order Dismissing Cause with Prejudice in Hale v. Harding signed by Roy 0. Parker, attorney for plaintiff, and dated February 7, 1983.
2. A Notice of Deposition in Lee County Circuit Court, cause number 16,947, William F. Hale d/b/a Hale Construction v. H. Bruce Harrison and Patricia Harrison. The pleading and certificate are both signed by Roy 0. Parker and dated October 80, 1981. A Motion to Produce in Hale v. Harrison, filed November 4, 1981 and signed by Roy 0. Parker. An Answer to Amendment to Counterclaim in Hale v. Harrison. The pleading and certificate, dated April 5, 1982, are both signed by Roy 0. Parker.
3. Answers to Interrogatories Propounded to Defendant, Paul Rainey v. William F. Hale, cause number 16,981 in the Chancery Court of Lee County. The pleading and certificate, dated November 3, 1981, is signed by Roy 0. Parker. Several other documents from this same cause were introduced which reflected representation by Roy 0. Parker.
The State introduced evidence indicating Parker represented Hale in court on at least one occasion although Hale said he had no memory of it. Parker had also notarized some documents for Hale.
The State introduced a plat for Green Acres Subdivision filed in Lee County Chancery Court on September 24, 1986, which listed William F. Hale and Dwayne Spencer among the owners. The appearance bond filed by James Wright in Wright I listed Dwayne Spencer as a surety. The State called Spencer as a witness and he acknowledged his co-ownership of Green Acres and the fact that he signed as surety on the appearance bond of James Wright. Wright had worked, from the early eighties to mid 1988, part-time for Spencer when he owned BusyLad Rent-All. Spencer “thought a lot of James” and considered him a good friend and “very honest person.”
Spencer moved to Tupelo in 1969 as a National Guard advisor and met Hale, also a member of the guard, at that time. Over the years Hale and Spencer became good friends, often attending church and eating out together. The Spencers and Hales often travelled together, including short trips to Memphis and a trip to Brazil in the mid to late eighties. Spencer could not recall specifically but assumed he spoke with Hale about James Wright prior to Hale becoming a juror in the trial. The conversation probably included mention of Spencer’s belief that Wright was a fine individual, a good honest man and not guilty of the crimes with which he was charged. Spencer knew Hale had been summoned for jury duty, although he could not be sure it was for the Wright trial. Spencer did not think Hale had ever met Wright. Although subpoenaed as a character witness, Spencer did not testify and only came to the courthouse for the last day of the Wright trial; he did not see Hale at the courthouse but assumed Hale knew he was a potential character witness. Spencer said he did not attempt to influence Hale in anyway as concerned James Wright.
John Parker, Roy’s son who worked for Roy as a legal assistant and investigator, testified that William Floyd Hale’s son Von, of Hale Construction Company, built his house in 1987. Von Hale also remodeled Roy Parker’s law offices in 1987, but John Parker did not know if William Hale added the addition to his father’s house in 1981. John Parker said he did not see William Floyd Hale send any signals to him during the Wright trial nor did he acknowledge any signals.
The State called several jurors from Wright I the first of whom was Celeste Turner. Turner sat next to Hale in the jury box during the trial; Turner stated she clearly heard all of the questions asked during voir dire but did not respond as she felt none of them applied to her. During the trial, Hale made comments to Turner about the proceedings even though the jurors were instructed not to discuss the case until all the evidence was in. Wright’s daughter took the *535 stand against him and during a pause in her testimony Hale said to Turner, “I think it’s pitiful to hear a daughter talk that way about her father.”
Jury deliberations began Friday night and an informal vote yielded the following result: ten guilty, one not guilty and one undecided. Hale was the not guilty vote. Later that night Judge Gardner called the jury back to check their progress; David Morgan, the unofficial foreman, stated they had not yet reached a verdict, but he did not reveal the vote count. After the jury returned to the jury room for deliberations, Turner heard another juror crying in the bathroom. Juror Grace Fairley informed Turner that Dot Cor-bett was crying because she saw Hale give a signal to the defense attorneys. Corbett later came out of the bathroom looked at Hale and said, “I can’t believe you did that,” but did not elaborate at that time. Hale said he did not know what Corbett was talking about.
Deliberations ended around 11 p.m. Friday night and resumed approximately 7 a.m. Saturday at which time the undecided vote changed to guilty. Hale said he needed a witness or some evidence to change his vote although the jurors reminded him they were told during voir dire this was a circumstantial evidence ease and there would be no eyewitnesses or direct physical evidence. Hale came up with various hypotheses to show that Wright may not have committed the murder none of which the other jurors found reasonable. According to Turner Hale said, “Yes I do think he did it, but they didn’t prove their case,” and that he would not vote guilty. At some point during deliberations David Morgan stood up and said to Hale, “Well, I just want to know what this means?,” and held up two fingers. Hale leaned back in his chair, crossed his arms and said, “I don’t know what you are talking about.” Hale became unwilling to communicate or deliberate saying, “I’m not going to vote guilty, that’s the way it is and we can just sit her (sic) ‘til Christmas.” Turner never actually saw Hale send a signal to John Parker.
Grace Fairley was called as a witness and confirmed that Dot Corbett had told her she saw Hale give a signal to John Parker. Fair-ley also corroborated the separate confrontations of Hale by Corbett and Morgan. After Morgan asked Hale about the signal, Fairley said, “Mr. Hale, this is the second time you have lied to us, and that if we are ever going to solve this problem, that we are going to have to be honest, at least with each other.” Hale sat back in his chair, his face turned red and he looked angry. Fairley also stated that Hale gave unreasonable hypotheses and wanted physical evidence. During the course of the trial Hale pointed out his wife in the courtroom to Fairley. Next to his wife were a man and a woman he identified as their “very best friends” who were there to observe; Hale said he and his wife often vacationed with the couple. After the confrontation between Morgan and Hale over the signal, Fairley questioned Hale about his relationship with Roy and John Parker. Hale denied knowing them. Fairley confirmed Hale’s statement that he believed Wright was guilty but would not vote guilty. Fairley never actually saw the signal given to Parker.
David Morgan was called to the stand and confirmed Hale stated he thought Wright committed the murder but would not vote guilty "without physical evidence; Hale said when he was a railroad investigator he was told someone cannot be convicted for murder without the murder weapon. Morgan saw Hale make a gesturing motion with two fingers of his left hand to John Parker who nodded his head in return. Morgan knew that Dot Corbett was upset Friday night although he was not sure why; he did hear Corbett say “I can’t believe you did that” to Hale. On Saturday the jury continued to deliberate and Morgan, becoming frustrated by Hale’s refusal to explain any of his hypotheses, confronted him in regard to the signal. When Hale said he did not do anything and did not know what Morgan was talking about Morgan said, ‘You’re lying ... I saw you do it. You are lying to yourself and don’t lye (sic) to me about it too.” Shortly after this exchange it became apparent the jury could not reach a verdict and the court declared a mistrial. Morgan said Hale may have also given a signal on Saturday *536 though Morgan admitted he may have imagined it because he was so angry with Hale at the time.
Tommy Collins, another juror in Wright I, was called as a witness for the defense. Collins was a neighbor of Hale and he lived in a house built by Hale. Collins was also a first cousin of Assistant District Attorney Sam Reedy, but Collins revealed this information during voir dire and Collins was allowed to become a juror when he explained that the relationship would have no influence on his ability to be impartial. Collins did not recall seeing Hale send a signal to the defense, but he did remember Dot Corbett being upset Friday night.
William Floyd Hale took the stand in his own defense and denied having ever done business directly with Roy Parker. Hale claimed he only dealt with associates in Parker’s office. Hale said he had hearing loss but was not wearing hearing aids at the time of the Wright trial because he had lost them and did not have enough money to buy a new set. He claimed to have asked Judge Gardner and Young to speak up during voir dire, but when asked to locate these exchanges in the record, Hale explained that he motioned them to speak up without actually saying anything. Hale heard questions about relationships to attorneys but thought they did not apply to him. The first time the question regarding possible relationship to attorneys was asked, a juror responded to a previous question sending the voir dire in a different direction. The second time the question was asked, a juror explained his relationship with one of the attorneys but said it did not affect his impartiality. Hale then thought his acquaintance with Parker was not important enough to merit response.
Hale confirmed he knew Dwayne Spencer, however, he testified that he was not influenced in any way by this relationship and did not seek to become a juror in order to help Wright. Hale denied signalling John Parker. Hale did build an addition to Roy Parker’s house in the early eighties but did not participate in remodeling his office. Hale claimed Spencer never expressed an opinion as to the innocence of Wright prior to the trial.
Hale makes numerous assignments of error, one of which requires reversal.
DID THE TRIAL COURT ERR IN REFUSING INSTRUCTION D-8?
Instruction D-8 reads as follows:
The court instructs the jury for the defendant that each and every material averment as to the falsity of defendant’s testimony at former trial must be proven by the testimony of two witnesses, or by one witness and corroborating evidence; beyond all reasonable doubt to every man of this jury.
This is commonly known as the “two-witness” rule which is derived from the common law and accepted in Mississippi. Hogan v. State, 516 So.2d 474, 478 (Miss.1987). See also Nash v. State, 244 Miss. 857, 147 So.2d 499, 502 (1962). It has long been the law of Mississippi that an instruction concerning the quantity of evidence required in a perjury trial should be given by the State. Nash, supra at 502; Gordon v. State, 158 Miss. 185, 128 So. 769 (1930); Saucier v. State, 95 Miss. 226, 48 So. 840, 841 (1909). See also Weiler v. United States, 323 U.S. 606, 611, 65 S.Ct. 548, 551, 89 L.Ed. 495 (1945). The instruction requested by Hale is substantially similar to one offered by the trial court in Clanton v. State, 210 Miss. 700, 50 So.2d 567, 571 (1951).
Saucier, Nash, Weiler and Clanton, supra, all hold that failure to give the instruction is reversible error. Relying on Gordon, the prosecution states the following in its argument that the requirements of the rule were met:
In the case at bar, on the evidence, the verdict of the jury was correct; and, although the jury should have been advised as to the quantum of evidence required in a perjury case, it is manifest that the want of it in this case did not harm this appellant, for the reason that the evidence measures up to the requirement of the rule as to the quantum thereof neces *537 sary to sustain a conviction. (Emphasis added).
Gordon, 128 So. at 769.
In Gordon, no witnesses were called for the defense and the witnesses for the State were not impeached or contradicted. Hale did testify in his own behalf that he only knew Roy Parker casually and did not send a signal to John Parker; it must be pointed out that the prosecution put on only one witness, David Morgan, who claimed to actually see the signal. The legal documents introduced as evidence demonstrated a connection between Roy Parker and Hale, but the jury could also accept Hale’s explanation that he only had significant contact with associates. Hale claimed he was not influenced by his friendship with Dwayne Spencer and did not discuss Wright with him. Spencer said he did not attempt to influence Hale but did think they talked about the case; the resolution of this discrepancy was for the jury.
If the present case was challenged on appeal solely on the legal sufficiency of the evidence, Hale would undoubtedly lose. But the present issue goes to the weight of the evidence, and the two witness rule is a crucial guideline in perjury cases:
The jurors empaneled to try the perjury case were the sole judges of the credibility of the witnesses and the weight to be given to the testimony of each witness. It was important that the jurors be correctly informed as to the “quantity” of proof required to authorize a conviction for perjury; and the State, somewhere in its own charges, should have asked that the jury be informed that, before they could convict, it must be shown to their satisfaction by the testimony of two witnesses or the testimony of one witness and corroborating circumstances that the appellant’s allegedly perjured testimony ... was false.
Nash, 147 So.2d at 503.
As a general rule, the two witness rule still applies since the cases that hold that failure to instruct the jury in accordance with the two witness rule is not reversible error are generally limited to their facts and involve testimony or documentary evidence that cannot be refuted. State v. Boratto, 80 N.J. 506, 404 A.2d 604, 606 (1979) (testimony of two handwriting experts that signature on will was forgery); Goins v. United States, 99 F.2d 147, 149 (4th Cir.1938) (genuine signature on hotel registration card placed defendant in Chicago at specific time although he claimed to have been elsewhere).
The documentary testimony in the present case only establishes a relationship between Hale and Roy Parker. It was for the jury to decide if the evidence indicated Hale was influenced by the association to the extent he would “wilfully and corruptly” refrain from answering pertinent voir dire questions. The testimony of the Wright jurors said Hale was unreasonable and would not vote guilty even after professing a belief in Wright’s guilt; Hale denied this and the jury was free to choose either version. One specific witness or piece of documentary evidence cannot be singled out as having been sufficient to convict Hale of perjury; there is no “smoking gun.” The fact that on appeal the verdict of the jury can be supported by the evidence does not automatically excuse failure to give the required two witness rule:
It is argued that this error did not prejudice the defendant. We cannot say that it did not. The jury convicted without being instructed that more than the testimony of a single witness was required to justify their verdict. This was no mere “technical” error relating to the “formalities and minutiae” of the trial, (citation omitted) We are not authorized to look at the printed record, resolve conflicting evidence, and reach the conclusion that the error was harmless because we think the defendant was guilty. That would be to substitute our judgment for that of the jury and, under our system of justice, juries alone have been entrusted with that responsibility.
Weiler, 323 U.S. at 611, 65 S.Ct. at 551.
It may be claimed that the outcome of the trial would have been no different had the two witness instruction been given, but this can be said of several of the cases in which the rule was technically met but reversible error was found because the court failed to give the instruction. In any event, the State should give the instruction even if the de *538 fense fails to request it. Here Hale requested it and was entitled to it.
The trial court committed reversible error by failing to instruct the jury in accordance with the “two witness” rule as required in perjury eases. We therefore reverse and remand for a new trial.
REVERSED AND REMANDED FOR A NEW TRIAL.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and PITTMAN, BANKS and MeRAE, JJ. concur.
BANKS, J., concurs with separate written opinion joined by SULLIVAN, J.
SMITH, J., dissents with separate written opinion.
JAMES L. ROBERTS, Jr., J., not participating.